## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE VLADIMIR GUSINSKY REV. TRUST, On Behalf of Itself and All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | CLASS ACTION |
| GIGPEAK, INC., AVI KATZ, NEIL J. MIOTTO, KIMBERLY D.C. TRAPP, JOSEPH J. LAZZARA, JOHN J. MIKULSKY, FRANK W. SCHNEIDER, INTEGRATED DEVICE TECHNOLOGY, INC., and GLIDER MERGER SUB, INC., | ) ) ) ) ) ) ) ) ) | DEMAND FOR JURY TRIAL |
| Defendants. | ) ) | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by its undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to itself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This action stems from a proposed transaction announced on February 13, 2017 (the "Proposed Transaction"), pursuant to which GigPeak, Inc. ("GigPeak" or the "Company") will be acquired by Integrated Device Technology, Inc. ("Parent") and its wholly-owned subsidiary, Glider Merger Sub, Inc. ("Merger Sub," and together with Parent, "IDT").

2.     On February 13, 2017, GigPeak's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement").  Pursuant to the terms of the Merger Agreement, IDT commenced a tender offer, set to expire on April 3, 2017, and stockholders of GigPeak will receive $3.08 per share in cash.

3.      On March 7, 2017, defendants filed a Solicitation/Recommendation Statement (the "Solicitation Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Solicitation Statement omits material information with respect to the Proposed Transaction, which renders the Solicitation Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(e), 14(d), and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Solicitation Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(e), 14(d), and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of GigPeak common stock.

9.      Defendant GigPeak is a Delaware corporation and maintains its principal executive offices at 130 Baytech Drive, San Jose, California 95134.  GigPeak's common stock is

traded on the NYSE MKT under the ticker symbol "GIG."

10.     Defendant Avi Katz ("Katz") is a director of GigPeak and has served as Chairman of the Board and Chief Executive Officer ("CEO") since 2007.

11.     Defendant Neil J. Miotto ("Miotto") has served as a director of GigPeak since December 2008.  According to the Company's website, Miotto is Chair of the Audit Committee and a member of the Compensation Committee.

12.     Defendant Kimberly D.C. Trapp ("Trapp") is a director at GigPeak.  According to the Company's website, Trapp is a member of the Audit Committee and the Compensation Committee.

13.     Defendant Joseph J. Lazzara ("Lazzara") has served as a director of GigPeak since July 2011.  According to the Company's website, Lazzara is a member of the Audit Committee and the Compensation Committee.

14.     Defendant John J. Mikulsky ("Mikulsky") is a director of GigPeak.  According to the Company's website, Mikulsky is Chair of the Compensation Committee and a member of the Audit Committee.

15.     Defendant Frank W. Schneider ("Schneider") is a director of GigPeak.  According to the Company's website, Schneider is a member of the Audit Committee and the Compensation Committee.

16.     The defendants identified in paragraphs 10 through 16 are collectively referred to herein as the "Individual Defendants."

17.     Defendant Parent is a Delaware corporation and a party to the Merger Agreement.

18.     Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

**CLASS ACTION ALLEGATIONS**

19.     Plaintiff brings this action as a class action on behalf of itself and the other public stockholders of GigPeak (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

20.     This action is properly maintainable as a class action.

21.     The Class is so numerous that joinder of all members is impracticable.  As of February 10, 2017, there were approximately 67,421,437 shares of GigPeak common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

22.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

23.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

24.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to

protect their interests.

25.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

***Background of the Company and the Proposed Transaction***

26.     GigPeak is a lead innovator of semiconductor ICs and software solutions for high-speed connectivity and high-quality video compression over the Network and the Cloud.

27.     The Company's focus is developing and delivering products that enable lower power consumption and faster data connectivity, more efficient use of network infrastructure, broader connectivity to the Cloud, and reduce the total cost of ownership of existing network pipes from the core to the end user.

28.     GigPeak addresses both the speed of data transmission and the amount of bandwidth the data consumes within the network, and provides solutions that increase the efficiency of the Internet of Things, leveraging its strength in high-speed connectivity and highest quality video compression.

29.     The Company's extended product portfolio provides more flexibility to support changing market requirements from ICs and MMICs through full software programmability and cost efficient custom ASICs.

30.     On February 13, 2017, GigPeak issued a press release wherein it reported record financial results for the fourth quarter and fiscal year 2016.

31.     For fiscal year 2016, the Company reported record revenue of $58.7 million, an increase of 45 percent above the $40.4 million in fiscal year 2015.  GAAP net income was a

record $2.2 million, or $0.04 per diluted share, up from net income of $1.2 million, or $0.03 per diluted share, in fiscal year 2015.  Non-GAAP net income was a record $12.1 million, or $0.20 per diluted share, up from net income $7.3 million, or $0.19 per diluted share, in fiscal year 2015.  Additionally, adjusted EBITDA was a record $16.5 million, up from $10.1 million in fiscal year 2015.

32.     For the fourth quarter of 2016, the Company reported record revenue of $16.2 million, up 3 percent from $15.8 million in the third quarter of fiscal year 2016, and up 46 percent from $11.1 million in the fourth quarter of fiscal year 2015.  GAAP and non-GAAP net income were $1.5 million and a record $3.6 million, respectively.  This compared to GAAP and non-GAAP net income of $0.7 million and $3.5 million, respectively, in the third quarter of fiscal year 2016, and $0.3 million and $2.2 million, respectively, in the fourth quarter of fiscal year 2015.  Additionally, adjusted EBITDA was a record $5.0 million, compared to $4.6 million in the third quarter of fiscal year 2016 and $2.9 million in the fourth quarter of fiscal year 2015.

33.     With respect to the record results, Individual Defendant Katz, Chairman, CEO, and founder of the Company, commented:

> Fiscal 2016 was a transformative year for GigPeak and culminated in the *best quarterly and annual financial performance in the Company's history*[.] We significantly expanded the product portfolio during the year with the strategic acquisition of Magnum Semiconductor. This addition greatly expanded the addressable markets we serve, namely cloud connectivity, which include the network and broadcast segments, and further diversified our revenue stream. In addition, it increased our customer base and drove additional cross-selling opportunities to existing customers. In FY 2016 we also released a large number of new devices to support next generation data center communication links, as well as advanced optical ASICs.

(Emphasis added).

34.     Nevertheless, the Board caused the Company to enter into the Merger Agreement, pursuant to which GigPeak will be acquired for inadequate consideration.

35.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Sections 5.3(a) and (b) of the Merger Agreement state:

(a) The Company shall and shall cause each of the Company Subsidiaries and its Representatives to immediately (i) cease and cause to be terminated any solicitation, encouragement, discussions or negotiations with any Persons that may be ongoing with respect to a Competing Proposal or Competing Inquiry and (ii) request, and thereafter use commercially reasonable efforts to cause, each Person that has previously executed a confidentiality agreement in connection with such Person's consideration of a Competing Proposal to return to the Company or destroy any non-public information previously furnished to such Person or to any Person's Representatives by or on behalf of the Company or any Company Subsidiary.

(b) From and after the date of this Agreement until the Effective Time or, if earlier, the termination of this Agreement in accordance with ARTICLE VII, the Company shall not and shall cause each of the Company Subsidiaries and its and their Representatives not to, directly or indirectly, (i) solicit, initiate, knowingly facilitate or encourage (including by way of furnishing non-public information) any Competing Proposal or Competing Inquiry, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any other Person any information or afford to any other Person access to the business, properties, assets, books, records or any personnel of the Company or its Subsidiaries, in each case in connection with or for the purpose of encouraging or facilitating, a Competing Proposal or Competing Inquiry, (iii) approve, endorse, recommend, execute or enter into, or publicly propose to approve, endorse, recommend, execute or enter into any term sheet, letter of intent, memorandum of understanding, agreement in principle, acquisition agreement, merger agreement or similar Contract (other than an Acceptable Confidentiality Agreement) with respect to any Competing Proposal (an "Alternative Acquisition Agreement"), (iv) take any action to make the provisions of any Takeover Statute (including Section 203 of the DGCL) or any applicable anti-takeover provision in the Company's organizational documents inapplicable to any transactions contemplated by a Competing Proposal, (v) except at the written request of Parent, terminate, amend, release, modify, waive or knowingly fail to enforce any provision of the Company Rights Agreement or exempt any Person not affiliated with Parent from the definition of Acquiring Person thereunder, (vi) terminate,

amend, release, modify or knowingly fail to enforce any provision of, or grant any permission, waiver or request under, any standstill, confidentiality or similar contract entered into by the Company in respect of or in contemplation of a Competing Proposal (other than to the extent the Company Board determines in good faith, after consultation with the Company's independent financial advisors and outside legal counsel, that failure to take any such actions under this Section 5.3(b)(vi) would be reasonably likely to result in a breach of, or otherwise be inconsistent with, its fiduciary duties under applicable Law) or (vii) propose, resolve or agree to do any of the foregoing.

36.     Further, the Company must promptly advise IDT of any proposals or inquiries

received from other parties.  Section 5.3(d) of the Merger Agreement states:

(d) From and after the date of this Agreement, the Company shall promptly (and in any event within 24 hours), notify Parent in the event that the Company, any Company Subsidiary or any of their Representatives receives (i) any Competing Proposal or a Competing Inquiry, (ii) any request for non-public information relating to the Company or any Company Subsidiary other than requests for information in the ordinary course of business consistent with past practice and unrelated to a Competing Proposal or Competing Inquiry or (iii) any Competing Inquiry or request for discussions or negotiations regarding any Competing Proposal.  In connection with such notice, the Company shall indicate the identity of such Person or group of Persons, provide a description of the material terms and conditions of such Competing Inquiry, Competing Proposal, indication or request and provide a copy of all written materials provided in connection with such Competing Inquiry, Competing Proposal, indication, or request, including any modifications thereto.  Thereafter, the Company shall keep Parent informed (orally and in writing) on a current basis (and in any event at Parent's request and otherwise no later than 24 hours after the occurrence of any material changes, developments, discussions or negotiations) of the status of any Competing Inquiry, Competing Proposal, indication, or request (including the material terms and conditions thereof and of any modification thereto), and any material developments, discussions and negotiations, including furnishing copies of all written materials received by the Company or its Subsidiaries or their respective Representatives relating thereto.  Neither the Company nor any Company Subsidiary will enter into any confidentiality agreement or other Contract with any Person subsequent to the date hereof which prohibits the Company from providing any information to Parent in accordance with this Section 5.3.

37.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out"

provision permitting the Board to withdraw its approval of the Proposed Transaction under

extremely limited circumstances, and grants IDT a "matching right" with respect to any

"Superior Proposal" made to the Company.   Sections 5.3(e) and (f) of the Merger Agreement

provide:

(e) From and after the date of this Agreement, except as expressly permitted by this Section 5.3(e) and subject in all respects to Section 5.3(f), neither the Company Board nor any committee thereof shall (i) withhold, withdraw, qualify or modify, or publicly propose to withhold, withdraw, qualify or modify the Company Board Recommendation, (ii) fail to include the Company Board Recommendation in the Schedule 14D-9, (iii) if a tender offer or exchange offer for shares of capital stock of the Company other than the Offer is commenced, fail to publicly recommend against acceptance of such tender offer or exchange offer by the stockholders of the Company (taking no position with respect to the acceptance of such tender offer or exchange offer by the stockholders of the Company, shall constitute a failure to recommend against acceptance of such tender offer or exchange offer) within five (5) Business Days after commencement thereof or fail to reaffirm the Company Board Recommendation within two (2) Business Days after Parent so requests in writing, (iv) adopt, approve or recommend, or publicly propose to adopt, approve or recommend, any Competing Proposal made or received after the date of this Agreement (any of the actions described in clauses (i) through (iv) of this Section 5.3(e), an "Adverse Recommendation Change") or (v) cause or permit the Company or any Company Subsidiary to enter into any Alternative Acquisition Agreement.  Notwithstanding anything to the contrary set forth in this Agreement, at any time prior to the Acceptance Time, the Company Board shall be permitted to effect any Adverse Recommendation Change (x) of a type described in clause (i) above solely with respect to a Superior Proposal, subject to compliance with Section 5.3(f), if the Company Board (A) has received a bona fide written Competing Proposal that the Company Board determines in good faith, after consultation with the Company's independent financial advisors and outside legal counsel, constitutes a Superior Proposal, after having complied with, and giving effect to all of the adjustments which may be offered by Parent and the Purchaser pursuant to Section 5.3(f) and (B) determines in good faith, after consultation with its legal advisors, that failure to take such action would be reasonably likely to result in a breach of its fiduciary duties under applicable Law or (y) in response to an Intervening Event the Company Board determines in good faith, after consultation with its legal advisors, that failure to make an Adverse Recommendation Change would be reasonably likely to result in a breach of its fiduciary duties under applicable Law; provided, that the Company Board may not make an Adverse Recommendation Change in response to an Intervening Event unless the Company (A) provides Parent with a written description of such Intervening Event in reasonable detail, (B) keeps Parent reasonably informed of material developments with respect to such Intervening Event, (C) notifies Parent in writing at least five (5) Business Days before making an Adverse Recommendation Change with respect to such Intervening Event of its intention to do so and specifying the reasons therefor and (D) during such five (5) Business Day period, either (1) Parent does not make a

bona fide proposal to amend the terms of this Agreement or (2) Parent makes a bona fide proposal to amend the terms of this Agreement that the Company Board considers in good faith, but following which the Company Board again determines in good faith, after consultation with its legal advisors and taking into account the terms of such proposal, that failure to make an Adverse Recommendation Change as a result of the applicable Intervening Event would be reasonably likely to result in a breach of its fiduciary duties under applicable Law.

(f) From and after the date of this Agreement, the Company Board shall not be entitled to effect an Adverse Recommendation Change with respect to a Superior Proposal unless (i) none of the Company, any Company Subsidiary or any of their Representatives has breached this Section 5.3 in any respect as relates to such Superior Proposal, including with result to any related Competing Proposal or Competing Inquiry, (ii) the Company has provided written notice (a "Notice of Superior Proposal") to Parent and the Purchaser that the Company intends to take such action, which notice includes an unredacted copy of the Superior Proposal that is the basis of such action (including the identity of the Third Party making the Superior Proposal) and copies of all relevant documents relating to such Superior Proposal, (iii) during the five (5) Business Days period following Parent's and the Purchaser's receipt of the Notice of Superior Proposal, the Company shall, and shall cause its Representatives to, negotiate with Parent and the Purchaser in good faith (to the extent Parent and the Purchaser desire to so negotiate) to make such adjustments in the terms and conditions of this Agreement so that such Superior Proposal would cease to constitute a Superior Proposal and (iv) following the end of the five (5) Business Days period, the Company Board shall have determined in good faith, after consultation with the Company's independent financial advisors and outside legal counsel, taking into account any changes to this Agreement proposed in writing by Parent and the Purchaser in response to the Notice of Superior Proposal or otherwise, that the Superior Proposal giving rise to the Notice of Superior Proposal continues to constitute a Superior Proposal.  Any amendment to the financial terms or any other material amendment of such Superior Proposal shall require a new Notice of Superior Proposal and the Company shall be required to comply again with the requirements of this Section 5.3(f); provided, however, that for purposes of this sentence, references to the five (5) Business Day period above shall be deemed to be references to a three (3) Business Day period.

38.     Further locking up control of the Company in favor of IDT, the Merger Agreement provides for a "termination fee" of $9,250,000, payable by the Company to IDT if the Individual Defendants cause the Company to terminate the Merger Agreement.

39.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful

competing offers for the Company.

40. Additionally, the Individual Defendants have entered into a tender and support agreement, pursuant to which they have agreed to tender their shares in the tender offer. According, such shares are already locked up in favor of the Proposed Transaction.

41. The merger consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

42. Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

43. Further, the merger consideration fails to adequately compensate the Company's stockholders for the significant synergies resulting from the merger.

44. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

45. Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

46. For example, Andrea Betti-Berruto ("Betti-Berruto"), the Company's co-founder and Chief Technology Officer; Darren Ma ("Ma"), the Company's Vice President and Chief Financial Officer; and Raluca Dinu ("Dinu"), the Company's Executive Vice President and Chief Operating Officer, have entered into agreements with IDT, pursuant to which they will be employed by IDT following the consummation of the Proposed Transaction.

47. Additionally, Individual Defendant Katz stands to receive $31,119,822 in connection with the Proposed Transaction, and Betti-Berruto, Ma, and Dinu stand to receive $7,129,049.

***The Solicitation Statement Omits Material Information, Rendering It False and Misleading***

48.     Defendants filed the Solicitation Statement with the SEC in connection with the Proposed Transaction.

49.     The Solicitation Statement omits material information regarding the Proposed Transaction, which renders the Solicitation Statement false and misleading.

50.     First, the Solicitation Statement omits material information regarding the financial analyses performed by the Company's financial advisors, Cowen and Company, LLC ("Cowen") and Needham & Company, LLC ("Needham"), in support of their so-called fairness opinions.

51.     For example, with respect to Cowen's *Discounted Cash Flow Analysis*, the Solicitation Statement fails to disclose:  (i) the terminal value of GigPeak; and (ii) the definition of unlevered free cash flow as used by Cowen.

52.     With respect to Cowen's *Analysis of Selected Publicly Traded Companies*, the Solicitation Statement fails to disclose the individual multiples and financial metrics for the companies observed by Cowen in its analysis.

53.     With respect to Cowen's *Analysis of Selected Transactions*, the Solicitation Statement fails to disclose the individual multiples and financial metrics for the transactions observed by Cowen in its analysis.

54.     With respect to Needham's *Discounted Cash Flow Analysis*, the Solicitation Statement fails to disclose:  (i) the range of illustrative terminal enterprise values for GigPeak; and (ii) the definition of unlevered free cash flow as used by Needham.

55.     With respect to Needham's *Selected Companies Analysis*, the Solicitation Statement fails to disclose the individual multiples and financial metrics for the companies observed by Needham in its analysis.

56.     With respect to Needham's *Selected Transactions Analysis*, the Solicitation Statement fails to disclose the individual multiples and financial metrics for the transactions observed by Needham in its analysis.

57.     With respect to Needham's *Premiums Paid Analysis*, the Solicitation Statement fails to disclose the merger and acquisition transactions observed by Needham in its analysis.

58.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

59.     The omission of this material information renders the Solicitation Statement false and misleading, including, *inter alia*, the following sections of the Solicitation Statement: (i) "Recommendation of the GigPeak Board"; (ii) "Background and Reasons for the GigPeak Board's Recommendation"; (iii) "Opinion of Cowen and Company, LLC"; (iv) "Opinion of Needham & Company, LLC"; and (v) "Certain Projected Financial Information."

60.     Second, the Solicitation Statement fails to disclose whether any of the non-disclosure agreements executed between the Company and potential bidders contained "don't ask, don't waive" provisions that were or are preventing those counterparties from submitting superior offers to acquire the Company.

61.     Without this information, stockholders may have the mistaken belief that, if these potentially interested parties wished to come forward with a superior offer, they are permitted to do so, when in fact they are contractually prohibited from doing so.

62.     The omission of this material information renders the Solicitation Statement false and misleading, including, *inter alia*, the following sections of the Solicitation Statement: (i) "Recommendation of the GigPeak Board"; and (ii) "Background and Reasons for the GigPeak

Board's Recommendation."

63.     Third, the Solicitation Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

64.     Specifically, the Solicitation Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of Gigpeak's officers and directors, including who participated in all such communications, including, but not limited to, such communications that took place on February 1, 2017.

65.     Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

66.     The omission of this material information renders the Solicitation Statement false and misleading, including, *inter alia*, the following sections of the Solicitation Statement: (i) "Recommendation of the GigPeak Board"; (ii) "Background and Reasons for the GigPeak Board's Recommendation"; and (iii) "Arrangements with Current Executive Officers and Directors of GigPeak."

67.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Gigpeak's stockholders.

## COUNT I

### (Claim for Violation of Section 14(e) of the 1934 Act Against Defendants)

68.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

69.     Section 14(e) of the 1934 Act states, in relevant part, that:

> It shall be unlawful for any person to make any untrue statement of a material fact
> or omit to state any material fact necessary in order to make the statements made,
> in the light of the circumstances under which they are made, not misleading . . . in
> connection with any tender offer or request or invitation for tenders[.]

70.     Defendants disseminated the misleading Solicitation Statement, which contained statements that, in violation of Section 14(e) of the 1934 Act, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not misleading.

71.     The Solicitation Statement was prepared, reviewed, and/or disseminated by defendants.

72.     The Solicitation Statement misrepresented and/or omitted material facts in connection with the Proposed Transaction as set forth above.

73.     By virtue of their positions within the Company and/or roles in the process and the preparation of the Solicitation Statement, defendants were aware of this information and their duty to disclose this information in the Solicitation Statement.

74.     The omissions in the Solicitation Statement are material in that a reasonable shareholder will consider them important in deciding whether to tender their shares in connection with the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available.

75.     Defendants knowingly or with deliberate recklessness omitted the material information identified above in the Solicitation Statement, causing statements therein to be materially incomplete and misleading.

76.     By reason of the foregoing, defendants violated Section 14(e) of the 1934 Act.

77.     Because of the false and misleading statements in the Solicitation Statement, plaintiff and the Class are threatened with irreparable harm.

78.     Plaintiff and the Class have no adequate remedy at law.

## COUNT II

### (Claim for Violation of 14(d) of the 1934 Act Against Defendants)

79.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

80.     Section 14(d)(4) of the 1934 Act states:

Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

81.     Rule 14d-9(d) states, in relevant part:

Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof[.]

Item 8 requires that directors must "furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading."

82.     The Solicitation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits the material facts set forth above, which renders the Solicitation Statement false and/or misleading.

83.     Defendants knowingly or with deliberate recklessness omitted the material information set forth above, causing statements therein to be materially incomplete and misleading.

84.     The omissions in the Solicitation Statement are material to plaintiff and the Class, and they will be deprived of their entitlement to make a fully informed decision with respect to the Proposed Transaction if such misrepresentations and omissions are not corrected prior to the

expiration of the tender offer.

85.     Plaintiff and the Class have no adequate remedy at law.

## COUNT III

### (Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and IDT)

86.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

87.     The Individual Defendants and IDT acted as controlling persons of GigPeak within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of GigPeak and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Solicitation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

88.     Each of the Individual Defendants and IDT was provided with or had unlimited access to copies of the Solicitation Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

89.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Solicitation Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly connected with and involved in the making of the Solicitation Statement.

90.     IDT also had direct supervisory control over the composition of the Solicitation Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Solicitation Statement.

91.     By virtue of the foregoing, the Individual Defendants and IDT violated Section 20(a) of the 1934 Act.

92.     As set forth above, the Individual Defendants and IDT had the ability to exercise control over and did control a person or persons who have each violated Section 14(e) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.

93.     As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

94.     Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment and relief as follows:

A.      Enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Directing the Individual Defendants to file a Solicitation Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Declaring that defendants violated Sections 14(e), 14(d), and 20(a) of the 1934

Act, as well as Rule 14a-9 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for

plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 8, 2017                      **RIGRODSKY & LONG, P.A.**

                                          By:   */s/ Brian D. Long*
                                                Seth D. Rigrodsky (#3147)
                                                Brian D. Long (#4347)
                                                Gina M. Serra (#5387)
                                                2 Righter Parkway, Suite 120
                                                Wilmington, DE 19803
**OF COUNSEL:**                                 Tel.: (302) 295-5310
                                                Facsimile: (302) 654-7530
**RM LAW, P.C.**                                Email: sdr@rl-legal.com
Richard A. Maniskas                             Email: bdl@rl-legal.com
1055 Westlakes Drive, Suite 3112                Email: gms@rl-legal.com
Berwyn, PA 19312
Tel.: (484) 324-6800                            *Attorneys for Plaintiff*